878 F.2d 659
 11 ITRD 1293, 57 USLW 2732, 11
U.S.P.Q.2d 1001
 WEIL CERAMICS AND GLASS, INC. a New York Corporation
v.
Bernard DASH, an individual and Jalyn Corp., a corporation.
Appeal of WEIL CERAMICS & GLASS, INC.
Appeal of Bernard DASH and Jalyn Corp.
 Nos. 86-5187, 86-5207.
 United States Court of Appeals,
Third Circuit.
 Reargued Nov. 14, 1988.
Decided May 25, 1989.
As Modified July 10, 1989.
 
 John N. Bain (argued), Carella, Byrne, Bain & Gilfillan, Roseland, N.J., for appellants & cross appellee.
 Bernard R. Gans (argued), Poms, Smith, Lande and Rose, Los Angeles, Cal., for appellee & cross appellants.
 Jamie S. Gorelick (argued), Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for amicus--47th Street Photo, Inc.
 Before HIGGINBOTHAM and BECKER, Circuit Judges, and DUMBAULD, District Judge.*
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 On this appeal we are asked to determine the availability of trademark and tariff act protections to an American company--which is owned by the same entity that owns the foreign manufacturer of a good, but which holds a valid American trademark for the foreign manufactured good--against parallel imports or so-called "gray-market" goods. Specifically, we are asked to determine whether Sec. 32 of the Lanham Act, 15 U.S.C. Sec. 1114 (1982), makes damages available to the American trademark holder for trademark infringement and if Sec. 42 of that act, 15 U.S.C. Sec. 1124 (1982), may be employed on behalf of the American company to prohibit the importation of gray-market goods.
 
 
 2
 This appeal also raised the question of whether Sec. 526 of the Tariff Act, 19 U.S.C. Sec. 1526 (1982), could be employed to preclude the importation of gray-market goods. That section has been construed by the Customs agency in its regulations as allowing the importation of gray-market goods in those cases where the American trademark holder is owned by, or owns, the foreign manufacturer of the good. See 19 C.F.R. Sec. 133.21 (1987). Appellee/Cross-Appellant contended, and the district court found, that the Custom's agency's regulation was inapplicable. Since the filing of this appeal, however, the agency's regulation was construed in a decision of the Supreme Court--unrelated to the present appeal--which raised the same issue. See K Mart Corp. v. Cartier, Inc., --- U.S. ----, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). That decision controls the claim raised by the Appellee/Cross-Appellant regarding Sec. 526 in this case, and directs that the decision entered by the district court on its behalf be reversed. K Mart is also instructive to the disposition of the Appellee/Cross-Appellant's contentions regarding Secs. 42 and 32. We conclude that neither of these sections provides the relief sought and, accordingly, we will reverse the decision of the district court.
 
 
 3
 Finally, we conclude that the district court erred by dismissing the contention raised by Appellee/Cross-Appellant under Sec. 33(b) of Lanham Act, 15 U.S.C. Sec. 1115(b) (1982), on the grounds that that section does not expressly or implicitly provide a right for private action. We conclude that Sec. 33(b) may be used by a private litigant in an infringement action and, therefore, we will reverse the judgment of the district court. Notwithstanding that conclusion, however, we will remand with instructions that judgment be entered in favor of the Appellant/Cross-Appellee. We review, de novo, the appropriate scope of the statute and conclude that Sec. 33(b) does not provide the remedy sought by the Appellee/Cross-Appellant in this case.I. Background
 
 
 4
 This is an appeal about gray-market goods.[1] Appellee/Cross-Appellant, Weil Ceramics & Glass, Inc., ("Weil"), is the wholly owned subsidiary of Lladro Exportadora, S.A., a Spanish corporation that is a sister corporation to Lladro, S.A., which manufactures fine porcelain in Spain.[2] The porcelain is handmade and each piece bears the trademark "LLADRO," accompanied by a flower logo.
 
 
 5
 In February 1966, Weil, a New York corporation in the business of importing and selling fine porcelain and glassware, became the exclusive distributor in the United States of Lladro porcelain. The following year Weil obtained a valid United States registration for the LLADRO trademark and continued as the exclusive distributor of the porcelain.
 
 
 6
 In 1973, Lladro, S.A. acquired 50% of Weil's stock. At that time, Weil assigned all of its rights in its United States LLADRO trademark to Lladro, S.A. In 1977, Lladro Exportadora obtained Lladro, S.A.'s shares of Weil stock, as well as the remaining 50% of Weil stock, and became the sole owner of Weil. In 1983, Lladro Exportadora assigned the United States LLADRO trademark back to Weil.
 
 
 7
 In 1982, Appellants/Cross-Appellees Jalyn Corporation and its president, Bernard Dash, (together "Jalyn"), began importing LLADRO porcelain. Jalyn legally obtained the porcelain in Spain from distributors of Lladro, S.A. and sold it in the United States without the consent of Weil. In 1984, Weil filed a complaint in the federal district court for the district of New Jersey seeking declaratory and injunctive relief against Jalyn's continued import of Lladro porcelain and money damages for trademark infringement.
 
 The District Court's Decision
 
 8
 In its complaint, Weil contended that Jalyn's import and sale of Lladro porcelain violated Weil's exclusive right to use the trademark pursuant to Sec. 33(b) of the Lanham Act. 15 U.S.C. Sec. 1115(b)(1982). Weil further contended that Jalyn's actions constituted an infringement on its trademark in violation of Secs. 32(1)(a) and 42 of the Lanham Act, and a violation of Sec. 526 of the Tariff Act. 19 U.S.C. Sec. 1526 (1982). After the completion of discovery, Weil and Jalyn filed cross motions for summary judgment.
 
 
 9
 The district court dismissed Weil's contention under Sec. 33(b) because it concluded that that section does not provide for private enforcement. It held that the language of Sec. 33(b) "does not establish any intent by Congress to create a cause of action." Weil Ceramics & Glass, Inc. v. Dash, 618 F.Supp. 700, 703 (D.N.J.1985). The district court determined that Sec. 33(b) "merely states the evidentiary status of an incontestable mark," id., and noted that "Sec. 32 [of the Lanham Act] provides an effective remedy for the owner of a mark which has been improperly used by another.... [and] since Sec. 32 expressly provides a remedy, the statutory scheme effectively negates any congressional intent to create a cause of action under Sec. 33(b)." Id. at 704.
 
 
 10
 In light of its conclusion regarding Sec. 33(b), the district court stated its view that Weil's infringement action turned upon Sec. 32. On the claim based on that section, however, the district court granted Weil's motion for summary judgment. It held, in pertinent part, that "[i]n order to prevail on its claim under Sec. 32(1)(a), Weil must show that ... [Jalyn's] use [of the LLADRO trademark] is likely to cause 'confusion.' " Weil Ceramics, 618 F.Supp. at 704. Jalyn had argued, as it does on this appeal, that because the porcelain that it sold was genuine--i.e., the trademark was affixed by the manufacturer and was no different in character from the porcelain sold by Weil--the goods did not cause the "confusion" to which Sec. 32(1)(a) refers. The district court rejected that argument. It found that the porcelain goods imported by Jalyn "are not a copy or imitation," Id. at 703, but nonetheless concluded that the trademark act proscriptions applied. Noting that "relatively few cases have confronted this issue and the courts have split, ... [the district court] conclude[d] ... that genuine goods may cause confusion." Id. at 706.
 
 
 11
 As support for its holding, the district court relied principally upon the Supreme Court's decision in A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). The district court read that decision as having established the "territoriality principle" of trademark law which views trademarks as having separate legal existences in each country in which they are registered, and as symbolic of "the goodwill of the domestic markholder whose reputation backs the particular product in that territory." Weil Ceramics, 618 F.Supp. at 705. In that light, the district court concluded that "even if a trademark correctly identified the manufacturer of the goods, it would still be an infringing product if it deceived the public into believing that the domestic markholder's goodwill stood behind the product." Id. The district court then analyzed the factual evidence of Weil's independent goodwill in the LLADRO trademarked porcelain, and concluded that Weil had demonstrated that no issue of material fact existed concerning Weil's claim that Jalyn's distribution of the porcelain in the United States had infringed Weil's trademark. See id. at 706-14.
 
 
 12
 Finally, the district court reviewed Weil's contention that Sec. 42 of the Lanham Act and Sec. 526 of the Tariff Act precluded Jalyn's continued importation of the LLADRO porcelain. Jalyn sought summary judgment on this contention on two bases: first, Jalyn contended that Sec. 42, like Sec. 32, does not provide that genuine goods are subject to claims raised under the trademark act. The district court rejected that argument and cited the Supreme Court's decision in A. Bourjois & Co. v. Aldridge, 263 U.S. 675, 44 S.Ct. 4, 66 L.Ed. 501 (1923) for the proposition that "genuine goods may infringe under the trademark laws and further that such infringing goods would be excludable under both the trademark and customs laws." Weil Ceramics, 618 F.Supp. at 715. It noted that a separate federal statute provides that Sec. 42 and Sec. 526 are not applicable to importations into the Virgin Islands of "genuine foreign merchandise bearing a genuine foreign trademark." Id. at 715 (citing 48 U.S.C. Sec. 1643 (1982)). In light of that specific preclusion, the district court concluded that "[i]f Congress did not believe that genuine goods were excludable under Sec. 42 and Sec. 526, then it would not have had to create a special exception for imports into the Virgin Islands." Id. It held, therefore, that Jalyn's importation of the LLADRO porcelain infringed Weil's trademark pursuant to Sec. 42 and was excludable under Sec. 526.
 
 
 13
 Alternatively, Jalyn argued that neither Sec. 526 nor Sec. 42 could be employed to bar importation of the porcelain because of the federal regulation that explicitly excludes from Sec. 526's prohibition against parallel imports those goods that are distributed by a United States trademarkholder that has a corporate relationship with the foreign manufacturer. See 19 C.F.R. Sec. 133.21(c)(2) (1987). The district court also rejected that argument. It concluded that "Weil has established a separate and independent goodwill for the Lladro mark," Weil Ceramics, 618 F.Supp. at 715, and therefore had demonstrated that it was the "owner" of the trademark. In the district court's view, "whether the domestic markholder is independent does not depend on its relation to a foreign entity, but rather upon whether there is a distinct goodwill for the product in the United States." Id. at 716. The district court held that the "common control" exclusion from the prohibition of parallel imports was inapplicable because that exclusion did not define or limit the scope of Sec. 526 or Sec. 42, but rather only defined the Customs agency's role administering the statute. Id. at 717. It held that the exclusions in Secs. 133.21(c)(1) and (2) provided only that the goods imported by Jalyn were not subject to "automatic exclusion by Customs under the regulations." Id. at 718. (emphasis in original). Accordingly, the district court held that the regulation did not proscribe a judicial determination that the goods "cause[d] confusion under Sec. 42 and may be excluded under Sec. 526." Id. It found that such confusion existed and, therefore, that both Sec. 42 and Sec. 526 were available to preclude Jalyn's continued import of the porcelain.
 
 
 14
 Jalyn filed this appeal from the decision of the district court granting summary judgment to Weil on its claims regarding Secs. 32 and 42 of the Lanham Act and Sec. 526 of the Tariff Act. Weil cross-appealed the dismissal of its claim based upon Sec. 33(b) of the Lanham Act. Subsequent to the filing of appeals in this case, the Supreme Court granted certiorari review of a consolidation of cases, decided by the Court of Appeals for the District of Columbia, in which that Court of Appeals had determined that the Customs Agency's promulgation of Sec. 133.21 was inconsistent with Sec. 526. We held disposition of this appeal in abeyance curia advisari vult, pending the decision of the Supreme Court. In K Mart, the Supreme Court resolved explicitly one of the principal issues raised in the present appeal, and gave important guidance for the resolution of the remaining issues.
 
 
 15
 II. K Mart v. Cartier, Inc.
 
 
 16
 K Mart, similar to the present case, concerned the import of parallel goods without the consent of the American trademark holder. The focus of the Court's opinion was the Customs Agency's construction of Sec. 526 of the Tariff Act as reflected by its promulgation of Sec. 133.21. Section 526 prohibits the importation
 
 
 17
 into the United States [of] any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States ... unless written consent of the owner of such trademark is produced at the time of making entry.
 
 
 18
 19 U.S.C. Sec. 1526(a) (1982).[3] By its promulgation of Sec. 133.21, however, the Customs Agency construed Sec. 526 to except goods for which the United States trademark is not solely "owned by" a domestic entity. Accordingly, that regulation permits the entry of goods manufactured abroad by the "same person" who holds the United States trademark or by a person who is "subject to common control" with the United states trademark holder. 19 C.F.R. Secs. 133.21(c)(1), (2) (1987).[4]
 
 
 19
 In K Mart, the Court addressed claims that these two exceptions for "common control" and "authorized use" to Sec. 526's prohibition against parallel imports are inconsistent with Sec. 526. 108 S.Ct. at 1816-17. The Court determined that Secs. 133.21(c)(1) & (2) were reasonable constructions of ambiguity in the language of Sec. 526 and concluded that those sections were consistent with the intent of Sec. 526. 108 S.Ct. at 1814.
 
 
 20
 In its analysis, the Court identified three general case scenarios in which the gray-market goods issue is presented, and evaluated the reasonableness of the application of Sec. 133.21 to each of those scenarios. The case 1 scenario, which the Court described as prototypical, involves a domestic company--that is independent of the foreign manufacturer--which purchases the right from the foreign company to register and use that company's trademark in the United States. The case 2 scenario involves a domestic company that registers a trademark for a good produced by a foreign manufacturer with which the domestic company shares a corporate affiliation. This scenario has three variations: a foreign company that has an incorporated subsidiary in the United States which distributes its product domestically (case 2a); a domestic company that incorporates a subsidiary manufacturing company abroad and then imports its goods (case 2b); or a domestic company that establishes an unincorporated manufacturing division abroad and then imports the foreign manufactured product into the United States (case 2c). The case 3 scenario involves a domestic trademark holder that authorizes an independent foreign manufacturer to use its trademark. See id. 108 S.Ct. at 1814-15.
 
 
 21
 The opinion of the Court, written by Justice Kennedy, was founded upon different majorities for each of the holdings announced in its separate parts.[5] Significantly, however, that opinion stated the unanimous judgment of the Court regarding application of Sec. 133.21 to the scenario in which a domestic subsidiary is the trademark holder for foreign manufactured goods that are produced by its foreign parent. See K Mart, 108 S.Ct. at 1818. ("All Members of the Court are in agreement that the agency may interpret the statute to bar importation of gray-market goods in what we have denoted case 1 and to permit the imports under case 2(a)." ) (emphasis added). The Court concluded that the term "owned by," as it appears in Sec. 526, "is sufficiently ambiguous, in the context of the statute, that it applies to situations involving a foreign parent, which is case 2a." Id. The Court noted further that "[t]his ambiguity arises from the inability to discern, from the statutory language, which of the two entities involved in case 2a can be said to 'own' the U.S. trademark if, as in some instances, the domestic subsidiary is wholly owned by its foreign parent." Id.[6]
 
 
 22
 The case before us most closely resembles the case 2(a) scenario. Weil is the wholly owned subsidiary of the foreign manufacturer and, consistent with the Supreme Court's decision regarding that scenario, we are persuaded that Sec. 133.21 excludes the goods imported by Jalyn from Sec. 526's prohibition of parallel imports.
 
 
 23
 Weil argues that K Mart does not preclude it from protection against parallel importation by Sec. 526 because Weil has demonstrated factually that it is the independent owner of the United States LLADRO trademark even though Weil is not independent of the foreign manufacturer, Lladro, S.A. It reads K Mart as affirming only the application of Sec. 133.21 to instances of sham incorporation, in which a foreign manufacturer incorporates a shell domestic corporation so that it can control the distribution of its product in the United States without competition. Weil contends, essentially, that Sec. 133.21 is properly viewed as a presumption against the extension of Sec. 526 to goods imported in the 2(a) circumstance, but that that presumption should not be irrebuttable. Accordingly, it asserts that since it can demonstrate factually that it was not a sham incorporation by Lladro, S.A., and that it independently owns the LLADRO trademark, Sec. 133.21 should not operate to preclude the application of Sec. 526.
 
 
 24
 Although Weil is not a subsidiary that was incorporated by its parent, its affiliation with Lladro, S.A. enables it nonetheless to enjoy every benefit that inheres in the corporate relationship that the Supreme Court described in the case 2(a) scenario. More significantly, that relationship also provides the opportunity for the foreign manufacturer's control of the United States market--under the auspices of the trademark act--that Sec. 133.21 intended to preclude. Thus, although Weil was not a "sham" incorporated by Lladro with the specific intent to benefit from the protections of the trademark act, its present relationship with Lladro nonetheless presents the potential for undesired monopoly of the domestic market and warrants application of Sec. 133.21. Moreover, we note that the Court did not limit its holding in K Mart to the decision that Sec. 133.21 is a reasonable construction of Sec. 526 only so far as that regulation provides a "presumption" of ownership in the trademark. We read Sec. 133.21 as providing an absolute exception from Sec. 526 for the import of parallel goods in the case 2a scenario and we read K Mart as upholding that construction.[7]
 
 III. Sections 42 and 32
 
 25
 Weil argues that even if Sec. 526 does not bar importation by Jalyn of the LLADRO porcelain, Sec. 42--which was not specifically addressed in K Mart[8]--does. Moreover, Weil contends that nothing in K Mart precludes its recovery of damages for infringement under Sec. 32 for Jalyn's distribution of the LLADRO porcelain in the United States. We are persuaded, however, because of the relationship that Weil has with Lladro, S.A., that the protections afforded by Secs. 42 and 32 of the Lanham Act are also inapplicable.
 
 
 26
 Weil's argument on this point has two components: first, it asserts that it owns the United States LLADRO trademark independently of its foreign parent and, pursuant to the territoriality theory attributed to Katzel, it is entitled to the full measure of trademark protection provided by the Lanham Act. In that light, Weil contends that Sec. 42's preclusion of goods that "copy or simulate" a trademark and that Sec. 32's preclusion of marks that "imitate" a registered trademark are applicable--notwithstanding the fact that the goods are genuine and bear the trademark of the manufacturer--because Jalyn's importation of LLADRO porcelain into the United States, without Weil's permission, represents a "copying" of the registered United States trademark.
 
 
 27
 a. The "territoriality" theory
 
 
 28
 Weil's argument relies in large measure upon a theoretical concept of trademark law, attributed to the Supreme Court's decision in Katzel, that is the subject of significant debate in the courts, compare NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506 (9th Cir.) (rejecting the theory and distinguishing Katzel on its facts), cert denied --- U.S. ----, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987); Olympus Corp. v. United States, 792 F.2d 315 (2d Cir.1986) (same), cert. denied, --- U.S. ----, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988), with Dial Corp. v. Manghnani Inv. Corp., 659 F.Supp. 1230, 1238 (D.Conn.1987); Dial Corp. v. Encina Corp., 643 F.Supp. 951, 954 (S.D.Fla.1986); Bell & Howell: Mamiya Co. v. Masel Supply Co., 548 F.Supp. 1063, 1066 (E.D.N.Y.1982), preliminary injunction vacated, 719 F.2d 42 (2d Cir.1983). That theory is also the subject of significant discussion among the commentators. Compare Bicks, Antitrust and Trademark Protection Concepts in the Import Field, 49 T.M.R. 1255, 1257 (1959) (arguing that the holding of Katzel should be limited to the circumstances of that case) with Knoll, Gray-Market Imports: Causes, Consequences and Responses, 18 Law & Pol. in Int'l Bus. 145 (1986) (endorsing territoriality theory). As we discussed above, that theory recognizes the separate existence of a trademark in each territory in which it has been registered. In the present case, the district court was persuaded that the theory should be available to Weil in the circumstances of this case. We do not agree.
 
 
 29
 In reaching its decision, the district court relied significantly upon the rationale of the Supreme Court's decision in Katzel. That case also concerned the import of genuine goods without the consent of the holder of a valid United States trademark. It involved a United States company, Bourjois, that purchased all of the United States business, the good will and rights to the United States trademark in "Java" face powder from the French manufacturer. Bourjois was completely independent of the French company, and its purchase of the rights to the United States trademark in the face powder was made at significant expense. A competitor of Bourjois was able to purchase the face powder abroad, import it into the United States and market it here under the French trademark in competition with Bourjois. The Supreme Court, reversing the decision of the Court of Appeals for the Second Circuit, held that the import of the competing goods infringed the domestic trademark holder's rights.
 
 
 30
 The Court noted that the French manufacturer would violate its assignment agreement if it marketed the product in the United States itself and similarly, it could not usurp that agreement by benefitting from the sale abroad to Bourjois's United States competitor.
 
 
 31
 That case, however, does not present the same scenario as the present case. First, and perhaps most significantly, Bourjois was completely independent from the foreign manufacturer. It entered into an arms-length exchange to acquire the rights to the trademark with the clear intent that the foreign manufacturer would not market the trademarked good in the United States. See Katzel, 260 U.S. at 691, 43 S.Ct. at 245 (noting that the statute authorizing assignments clearly precluded the French manufacturers from directly entering the United States market and distributing the trademarked goods in competition with Bourjois). Moreover, Bourjois obtained control over the quality of the product and, presumably, could have improved the quality of the product that it marketed in the United States while retaining use of the trademark. It had no control over the goods that the foreign manufacturer sold abroad which were imported into the United states and sold with the same trademark. See NEC Electronics, 810 F.2d at 1509.
 
 
 32
 In the present case, no such compelling circumstances exist. Weil is not independent of the foreign manufacturer. Although it was not incorporated by Lladro, S.A., it nonetheless benefits from the corporate relationship that exits.[9] Thus, even if Weil loses some share of its United States market to Jalyn, it nonetheless benefits from the profits it received as part of the corporate entity from which Jalyn purchased the goods abroad. Moreover, if that corporate entity decides that the profit margin from the sale of the goods to Jalyn abroad is not as significant as would be the profit margin from a United States market in which Jalyn did not compete, it has an obvious self-help mechanism: it can cease the sale to Jalyn abroad and thereby eliminate effectively its United States competition with Weil.[10] We do not read the Lanham Act, however, to protect a foreign manufacturer--that either owns or is owned by a domestic trademark holder--from competition in the sale of its product in the United States by a domestic importer that it has supplied. Moreover, the LLADRO porcelain that Jalyn imports is identical to the porcelain that Weil distributes. See Weil Ceramics, 618 F.Supp. at 703 (the district court found that goods sold by Jalyn are "genuine Lladro merchandise and are not a copy or imitation.")[11] Weil has made no contention that, pursuant to its agreement with Lladro, S.A., Weil is entitled to, and does in fact, alter the quality of the porcelain that it distributes in the United States.
 
 
 33
 In our view, the Court's conclusion in Katzel does not represent the establishment of a broad "territoriality theory" applicable to every instance in which a domestic company acquires the United States trademark for a foreign manufactured good. We read that decision as creating an exception to the general application of trademark law in order to protect adequately the interests of domestic trademark holders such as Bourjois.
 
 
 34
 Our conclusion is consonant with both K Mart and Katzel, and illustrates the synthesis between those Supreme Court decisions. If placed within the context of the scenarios identified by the Court in K Mart, Katzel would be described as case 1. K Mart clearly held that Sec. 526 was intended to protect domestic trademark holders in that type of case and, indeed, Sec. 526 was enacted specifically to counter the decision of the Court of Appeals for the Second Circuit in Katzel which had reached the opposite result.[12] In our view, Katzel was intended specifically to reach the case 1 scenario and extend trademark act protection to domestic trademark holders that are truly independent of the foreign manufacturer. We do not read Katzel to extend beyond that circumstance. Indeed, in his explication of Katzel in K Mart, Justice Brennan noted that Bourjois, the domestic trademark holder in Katzel, was "the prototypical (case 1) gray-market victim, [that had] purchased its trademark rights, at arms length and at a substantial cost, from an unaffiliated foreign producer." K Mart, 108 S.Ct. at 1822 (Brennan, J. concurring). Justice Brennan stated that it was on the basis of those facts that the Supreme Court extended the trademark act protections to Bourjois. He noted, however, that
 
 
 35
 the gray-market encroachment on the Java market would have been considerably less troubling had Bourjois had control over the foreign manufacturer's import conduct or over its sales abroad to third parties who might import; it would essentially have been seeking to protect itself from its own competition.
 
 
 36
 Id. (emphasis added). Justice Brennan concluded that the reasons that compelled application of Sec. 526 to the case 1 instance (i.e. that the independent domestic trademark holder, unlike the affiliated holder, stands to lose the full benefit of its investment as the result of gray-market interference and it has no control over the importation of the competing goods or the sale to third parties abroad), do not apply to the case 2 instance. See id. at 1823. In his view,
 
 
 37
 [t]hese differences furnish perfectly rational reasons that Congress might have intended to distinguish between a domestic firm that purchases trademark rights from an independent foreign firm and one that either acquires identical rights from an affiliated foreign firm or develops identical rights and permits a manufacturing subsidiary or division to use them abroad.
 
 
 38
 Id. In that light, Justice Brennan perceived no basis for the conclusion that Sec. 526 was intended to reach the case 2 circumstance. In our view, Justice Brennan's opinion also demonstrates that Katzel was not intended to extend the provisions of Sec. 42 or Sec. 32 to the case 2 instance.
 
 
 39
 The view that we express today is shared by the Court of Appeals for the Ninth Circuit, which noted in NEC Electronics that the rationales supporting the Supreme court's decision in Katzel "presuppose the American owner's real independence from the foreign manufacturer, and courts interpreting Katzel have repeatedly emphasized this factor." NEC Electronics, 810 F.2d at 1509. The appellate court noted further that "[w]here the American trademark owner is a wholly-owned and controlled subsidiary of the foreign manufacturer, neither of the Katzel rationales applies." Id. at 1510. See also Olympus Corp., 792 F.2d at 321 (limiting Katzel to the "equities" presented by that case and holding that "[a]bsent the Katzel situation, [Sec. 42] applies only to merchandise bearing counterfeit or spurious trademarks that 'copy or simulate' genuine trademarks").
 
 
 40
 b. Goods that "copy," "simulate," "counterfeit," or "imitate"
 
 
 41
 Having concluded that Katzel did not create a broad territoriality principle that is applicable to every instance of parallel imports, we can more easily resolve the remainder of Weil's argument regarding Sec. 42 and Sec. 32. Essentially, Weil argues that our reading of Sec. 42's prohibition of goods that "copy or simulate" a United States trademark, and of Sec. 32's similar proscription of the commercial distribution of goods that "counterfeit" or "imitate" a valid United States trademark, should be informed by the principle attributed to Katzel. Accordingly, it argues, Weil's registration of the LLADRO trademark in the United States should be viewed as having created a trademark in the United States that is distinct from any other mark (even the identical mark placed by the same manufacturer) and that that mark should be accorded the full measure of United States trademark law. Weil contends, therefore, that its trademark is "copied" by any unauthorized use. In that light, Weil argues that, notwithstanding the fact that the porcelain imported by Jalyn is genuine and that the marks affixed to the porcelain are placed by the manufacturer just as the marks affixed to the porcelain sold by Weil, the porcelain that Jalyn imports "copies" Weil's trademark.
 
 
 42
 Because of our conclusion that nothing in Katzel extends the trademark act protections to the circumstances of this case, we need not attempt the strained interpretation of the language of Sec. 42 or Sec. 32 that Weil advocates. Our inquiry is only to discern the plain meaning of the language of those sections and, on that review, we do not reach the conclusion urged by Weil.[13]
 
 
 43
 As the starting point for our analysis, we must ascertain the appropriate definition to be given to the terms employed by Sec. 42 and Sec. 32 of the Lanham Act. In pertinent part Sec. 42 provides that
 
 
 44
 no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this chapter ... shall be admitted to entry at any custom house of the United States.
 
 
 45
 15 U.S.C. Sec. 1124 (1982). Section 32(1)(a) provides that
 
 
 46
 (1) [a]ny person who shall, without the consent of the registrant--
 
 
 47
 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause a mistake or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided
 
 
 48
 15 U.S.C. Sec. 1114(1)(a) (1982). Weil urges that Sec. 42 is applicable to provide injunctive relief against importation even if Sec. 526 does not and that Sec. 32 is applicable to make damages available, and to provide injunctive relief against distribution, even if neither Sec. 526 or Sec. 42 bar importation. It contends that "the words 'copy or simulate' are neutral terms and are only directed to the physical and visual similarity between the registered mark and the mark on the imported product." Supplemental Brief of Appellee (Dec. 5 1988) at 2. Consequently, it argues, "[w]hether or not the act of importation is a violation of Sec. 42 depends on whether the importation is with or without the consent of the registrant." Id. We can perceive of no basis, either in the specific language of the statute or in its underlying intent that supports such a reading.[14]
 
 
 49
 In this inquiry of statutory construction, we are assisted again by the Supreme Court's decision in K Mart which noted that "[i]n ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as [to] the language and design of the statute as a whole." K-Mart, 108 S.Ct. at 1817 (citing Bethesda Hospital Ass'n v. Bowen, 485 U.S. 399, ----, 108 S.Ct. 1255, 1258, 99 L.Ed.2d 460 (1988); Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 220-21, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986)).[15] In the light of these precedents, we look first to the plain language of the statute, which do we do not find to be ambiguous. In our view, the language of these sections reflects Congress' intent to provide a remedy only to the domestic trademark holder who is injured by the distribution of like goods, which bear facsimile marks, that result in confusion to consumers or detriment to the goodwill developed by the trademark holder in the trademarked goods. "Trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the owner's consent." NEC Electronics, 810 F.2d at 1509 (citing Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp., 707 F.2d 1054, 1057-58 & n. 3 (9th Cir.1983); Diamond Supply Co. v. Prudential Paper Products Co., 589 F.Supp. 470, 475 (S.D.N.Y.1984)).
 
 
 50
 The terms "copy," "simulate," "counterfeit" and "imitate" have readily comprehensible ordinary meanings. They are used commonly to refer to items that resemble, but are not themselves, the original or genuine artifacts. We are convinced that the Congress understood this commonly held meaning of these terms and intended to apply them literally in Secs. 42 and 32.[16] We are, therefore, unpersuaded that those sections are properly applied to the present case.
 
 
 51
 Our analysis of the "design of the statute as a whole" compels us even more to the conclusion that we have reached. The stated intent of the trademark act is
 
 
 52
 to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.
 
 
 53
 15 U.S.C. Sec. 1127 (1982). From this statement of purpose, we discern two broad policy goals that Congress sought to foster by this legislation: (1) protection against consumer deception (i.e. purchase of a good that is not what the consumer intended to purchase, but because of packaging or other deceptive imitation of the trademark appears to be the genuine trademarked good); (2) protection of the trademark holder's investment in goodwill and noteworthiness that has been generated by the holder's advertisements and quality from imitative goods over which the trademark holder has no control of quality.[17] Sections 42 and 32 advance these policy goals but neither of the goals is undermined by the importation of genuine goods as in this case. Consumers who purchase Jalyn imported LLADRO porcelain get precisely what they believed that they were purchasing. For that same reason, Weil's investment in and sponsorship of its trademark is not adversely affected because the goodwill that stands behind its product is not diminished by an association with goods of a lesser quality.
 
 
 54
 The only "injury" that we perceive Weil endures is the uncompensated for benefit that its advertisement and promotion of the trademark confers upon Jalyn. That loss to Weil is not inconsequential or insignificant. The remedy for it, however, is not properly found in the trademark law, particularly not in this case. Moreover, as we noted earlier, that "injury" is not completely uncompensated because Weil's parent corporation profits by the sale of Jalyn abroad.[18]
 
 
 55
 It is more than likely that the framers of the trademark act did not contemplate the instance in which the "source" of a trademarked good would be different from its place of manufacture. The primary concern was to protect consumers and trademark holders from spurious imitations. In Katzel, the Court recognized that a broader measure of protection was necessary because of the difference in "source" between the trademark holder and the manufacturer in instances in which a foreign manufacturer sells its rights in the United States trademark to a domestic company. The Court, therefore, reasonably extended the trademark protections to that circumstance. In this case, however, for all intents and purposes, the trademark holder and the manufacturer are the same and there is no reason that compels us to read anything in the language of the act and extend further the protections of the trademark act to this circumstance.[19]
 
 IV. Section 33
 
 56
 Finally, we consider the contention, raised by Weil on appeal, that the district court erred by refusing to adjudicate the claim of infringement predicated upon Sec. 33 of the Lanham Act. 15 U.S.C. Sec. 1115 (1982). In pertinent part, that section of the trademark act provides that
 
 
 57
 [i]f the right to use the registered mark has become incontestable under [the applicable provision] of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed [pursuant to the provisions of this title] ...
 
 
 58
 15 U.S.C. Sec. 1115(b). As we have noted above, the district court did not reach this issue because it concluded that Sec. 33(b) did not provide a private right of action. In the district court's view, Sec. 33(b) only "makes an incontestable mark conclusive evidence of an owner's right to use the mark. It merely states the evidentiary status of an incontestable mark." Weil, 618 F.Supp. at 703. The district court's judgement rests upon a misreading of the Supreme Court's decision in Park'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) and, accordingly, we will reverse.
 
 
 59
 a. Private Enforcement of Sec. 33(b)
 
 
 60
 In its discussion of Sec. 33, the district court correctly noted that the Supreme Court's then recent decision in Park'N Fly was controlling. In our view, however, the district court's interpretation of that decision is in error. The district court concluded that Park'N Fly held only that the appellate court's decision in that case that Sec. 33 could only be used "defensively" was in error. In the district court's view, the Supreme Court's decision provided "that Sec. 33(b) could be used either offensively (by the registrant in an infringement action) or defensively. The Court did not, however, hold that Sec. 33(b), in and of itself, provided a private right of action." Weil, 618 F.Supp. at 704. This conclusion, however, appears internally inconsistent and, more significantly, directly contrary to the holding of Park'N Fly.
 
 
 61
 The district court notes that Park'N Fly may be used "offensively by the registrant in an infringement action," Weil, 618 F.Supp. at 704. The district court does not, however, explain how that use is made other than in the context of a private litigant (i.e., the registrant) seeking equitable enforcement of a registered trademark. Moreover, the district court does not reconcile its interpretation of Park'N Fly with the fact that that case itself was a private action by a registered trademark holder seeking injunctive relief pursuant to Sec. 33(b). The district court's conclusion regarding Sec. 33(b) is infected by the same error of interpretation that requires reversal of its decision regarding Sec. 32.
 
 
 62
 In the district court's view, the evidence of legislative intent that Sec. 33(b) not be enforced by private action is that Sec. 32 provides the enforcement mechanism for the rights provided by Sec. 33(b). We read these sections as providing protection for different rights. Section 33(b) was designed to provide an equitable remedy to the holder of a registered trademark whose ownership or entitlement to use of the trademark has been challenged by another party. Section 32, however, reaches an entirely different circumstance. That section provides a remedy to trademark holders whose trademarks have been infringed by spurious imitations or copies. In the latter instance, the challenging party is not asserting a right to use the exact mark, which is the circumstance of a Sec. 33(b) action, but rather contends that the copy that it employs is not sufficiently similar to the registered trademark to cause confusion. These actions are substantively different, and the district court was mistaken in its view that the remedy for a violation of Sec. 33(b) is found in Sec. 32.
 
 
 63
 Park'N Fly demonstrates clearly the Supreme Court's view that Sec. 33(b) provides for private enforcement. In its holding that Sec. 33(b) was intended to provide a basis for equitable remedy to a registrant whose right to use a trademark has been challenged, the Court noted that "[section] 33(b)'s declaration that the registrant has an 'exclusive right' to use the mark indicates that incontestable status may be used to enjoin infringement by others. A conclusion that such infringement cannot be enjoined renders meaningless the 'exclusive right' recognized by the statute." Park'N Fly, 469 U.S. at 198, 105 S.Ct. at 663. "Moreover," the Court noted, "the language in three of the defenses enumerated in Sec. 33(b) clearly contemplates the use of incontestability in infringement actions by plaintiffs." Id. (citing Secs. 33(b)(4)-(6), 15 U.S.C. Secs. 1115(b)(4)-(6) (1982)) (emphasis added).
 
 
 64
 In the present case, the district court's conclusion that Sec. 33(b) did not provide for private enforcement is inconsistent with the legislative intent of the Lanham Act, and with the Supreme Court's holding that "a conclusion that incontestable status can provide the basis for enforcement of the registrant's exclusive right to use a trade or service mark promotes the goals of the statute." Park'N Fly, 469 U.S. at 198, 105 S.Ct. at 663. Accordingly, the Court concluded that "[t]he incontestability provisions, as the proponents of the Lanham Act emphasized, provide a means for the registrant to quiet title in the ownership of his mark." Id. In light of the Supreme Court's guidance in Park'N Fly, we will vacate the decision of the district court in this case regarding Sec. 33(b).
 
 
 65
 b. Inapplicability of Sec. 33(b) to the present case
 
 
 66
 Our conclusion that the district court erred in its holding that Sec. 33(b) does not provide the basis for a private action, however, does not lead us to the conclusion that Weil can prevail on that claim in this case.
 
 
 67
 In the context of its discussion of the appropriate application of Sec. 33(b), the Supreme Court noted that "[t]he Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the good will of his business and to protect the ability of consumers to distinguish among competing producers." Park'N Fly, 469 U.S. at 198, 105 S.Ct. at 663. This explication of the rationale underlying the Lanham Act is consistent with our holding in this case regarding Secs. 32 and 42, and its application to Sec. 33(b) leads us similarly to the conclusion that that section is not properly applied to the circumstances of this case.
 
 
 68
 As we have noted above, Sec. 33(b) was intended to provide the means for a registered trademark holder to "quiet title in the ownership of his mark." Id. It is appropriately employed in the circumstance where a competing producer of a different good displays a registered trademark in the promotion of its good and contends on some ground (for example, it adopted use of the mark without knowledge of the registrant's prior use and before the registration under Sec. 33(b), see e.g., Thrifty Rent-A-Car System v. Thrift Cars, Inc., 831 F.2d 1177 (1st Cir.1987), or that the registrant abandoned the use of the trademark, see e.g., Kardex Systems, Inc. v. Sistemco, N.V., 583 F.Supp. 803 (D.Me.1984)) that the registrant should not have exclusive use of the trademarked item. This circumstance does not exist in the present case. The goods at issue are identical and the trademarks were affixed by the same party in both cases: the manufacturer. In our view, Sec. 33(b) was not intended to reach this case and, accordingly, we conclude that summary judgment in favor of Jalyn is appropriate. Cf. Wynn Oil v. Thomas, 839 F.2d 1183, 1187 (6th Cir.1988)(evaluating trademark infringement action that was brought pursuant to Sec. 33(b) and noting that its inquiry was "to determine whether consumers will be confused as to the origin of the product" because of something in the marks used to promote different products).
 
 V. Conclusion
 
 69
 In light of the foregoing, we will reverse the decision of the district court granting summary judgment in favor of Weil on its claims that Sec. 42 and Sec. 526 are correctly employed to enjoin Jalyn's importation of LLADRO porcelain. We will also reverse the decision of the district court granting summary judgment on behalf of Weil on its claim that Sec. 32 provides damages for infringement for Jalyn's distribution of the porcelain. Finally, we conclude that the district court erred by its dismissal of Weil's claim on Sec. 33(b), but notwithstanding that error, summary judgment in favor of Jalyn is appropriate. Accordingly, we will vacate the district court's judgment as to that claim, and remand with instructions that the district court enter summary judgment on behalf of Jalyn.
 
 
 70
 All parties to this appeal will bear their own costs.
 
 
 71
 BECKER, Circuit Judge, concurring.
 
 
 72
 I agree that Weil cannot prevail on any issues, hence I concur in the judgment. Moreover, I join in Parts I and II and footnote 14 of the majority opinion, subject to comments herein, which condition that joinder only peripherally. However, I do not join in Parts III and IV of the majority opinion because I take a different approach to the issues discussed in those sections. I write at length because of the conceptual difficulty of the issues, which implicate the current status of the territoriality, exhaustion and source doctrines in international trademark law, matters which the majority opinion found it unnecessary to address in any detail in view of its approach, yet which are of considerable legal and economic importance.
 
 
 73
 The majority bases its conclusion with respect to section 32 on the plain language of the Lanham Act.[1] I do not believe, however, that our task is so simple. The Lanham Act is only one facet of our governing trademark law, which is composed of the Act, the evolving common law, and international law, e.g., treaties.[2] Therefore, I find it necessary to inquire into the nature and scope of trademark rights.
 
 
 74
 I do not agree with the majority's "plain reading" and its apparent rejection of the notion that section 32 protects genuine goods. Moreover, while the majority's analysis of the A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), decision is tailored to this case, I believe that the majority has, however unintentionally, created untoward precedent by reading Katzel in one sense too broadly (implying that it should apply across the board, whenever the independent markholder is the victim of parallel importation), and in another sense too narrowly (insofar as it seems to suggest that Katzel can only be applied where the foreign manufacturer is wholly independent of the domestic markholder). In my view, Katzel is an example of a court sitting in equity at work, not a blanket change of trademark law. I also believe that the majority places too much reliance on K Mart Corp. v. Cartier, Inc., --- U.S. ----, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), insofar as it appears to rely on it as a vehicle for interpretation of all of Weil's claims, even though K Mart addressed only Sec. 526 of the Tariff Act and not the Lanham Act. I have looked instead to the law of this Circuit, the Paris Convention, and the history of trademark rights.
 
 
 75
 I conclude that trademarks are still territorial and that the source theory of trademark law is no longer viable. These conclusions lead me to believe, in contrast to the majority, that under current trademark law, genuine goods with genuine marks can serve as the basis for an infringement suit. I also believe that the record supports the view that Jalyn has imported genuine goods of lower quality than Weil's goods, creating the possibility of a likelihood of confusion. If so, Weil therefore has arguably satisfied the typical section 32 requirements on that ground as well. I do not believe, however, that Weil should prevail in this case.
 
 
 76
 Weil is a wholly owned subsidiary and as such has a complete unity of interest with its parent, Lladro, and therefore, self-help available to one is a fortiori available to the other. By sending into the stream of commerce identically marked goods of mixed quality, but only providing premium quality goods to Weil, and not informing the public of the different levels of quality, Lladro has in effect engineered the possibility of a likelihood of confusion and therefore infringement in this case. This is not the sort of injury trademark infringement actions under the Lanham Act were intended to remedy. And even if there is no material difference in quality, I believe that Weil has failed to make an adequate showing of independent good will. Thus, I conclude that Weil cannot prevail, because it has failed to prove cognizable likelihood of confusion, and I concur with the majority's conclusion that summary judgment in favor of Weil on the section 32 claim should be vacated and judgment entered in favor of Jalyn.
 
 I. SECTION 32 OF THE LANHAM ACT
 
 77
 The majority has apparently rejected the notion that section 32, interpreted in light of the developing common law and international law of trademarks,[3] analytically contemplates protection of genuine goods where the domestic markholder is affiliated with a foreign manufacturer. I disagree. And I find no indication in the language or history of the Act that affiliated trademark owners are to receive lesser protections than nonaffiliated trademark owners. I address these important concepts in light of the doctrinal underpinnings of international trademark law--the territoriality and source theories--and of the unity of interest notions implicated by Katzel and K Mart.
 
 A. The Territoriality Theory
 
 78
 The territoriality theory of trademark law was first introduced in this country by the Supreme Court decision of A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923). The majority opinion limits the application of the territoriality theory to the case 1 scenario, relying on Katzel. Maj. op. at 669. I disagree.
 
 
 79
 The Supreme Court in Katzel permitted an injunction to issue pursuant to section 27 of the Trade-Mark Act of 1905 where a wholly independent domestic corporation and assignee of a foreign corporation's trademark suffered a loss of business due to parallel imports.[4] Justice Holmes wrote: "It is said that the trade-mark here is that of the French house and truly indicates the origin of the goods. But that is not accurate. It is the trade-mark of the plaintiff only in the United States...." Katzel, 260 U.S. at 692, 43 S.Ct. at 245.
 
 
 80
 Under Justice Holmes's theory, the validity of a trademark may only be determined within the boundaries of the country in question. Carrying this reasoning to its logical extension, if an entity owns the United States trademark, it has rights under the United States trademark laws regardless of whether the manufacturer is domestic or foreign, affiliated or not. Judge Leval has stated the principles underlying the territoriality theory most eloquently:
 
 
 81
 This principle [territoriality] recognizes that a trademark has a separate legal existence under each country's laws, and that its proper lawful function is not necessarily to specify the origin or manufacture of a good (although it may incidentally do that), but rather to symbolize the domestic goodwill of the domestic markholder so that the consuming public may rely with an expectation of consistency on the domestic reputation earned for the mark by its owner, and the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce.
 
 
 82
 Osawa & Co. v. B & H Photo, 589 F.Supp. 1163, 1171-72 (S.D.N.Y.1984).[5]
 
 
 83
 Katzel is often invoked as proof of the viability of the territoriality theory in the United States. I do not believe, however, that Katzel is sufficient to justify that conclusion, as I discuss infra. Rather, we must find other grounds if we are to conclude that the territoriality theory is alive and well in American trademark jurisprudence.
 
 
 84
 As I read the majority opinion, it concludes that Katzel, should only be applied when the foreign manufacturer is wholly independent of the domestic markholder and that it "creat[es] an exception to the general application of trademark law," Maj. op. at 669, implying that it should apply across-the-board to all situations in which a wholly independent markholder is the victim of parallel importation.[6] I would interpret the holding of Katzel in a different way.
 
 
 85
 The powers of a court sitting in equity are to be applied on a case-by-case basis. As I see it, Katzel did not create a blanket trademark rule, but rather was a clear exercise of the flexible equitable powers of the Court and an attempt to remedy what was perceived to be unfair in an individual case. I therefore do not believe that Katzel mandates protection of independent domestic markholders who are assignees of foreign manufacturers in every instance. I also do not believe that Katzel precludes the possibility that an equitable remedy might be available even when the United States company is affiliated with a foreign manufacturer. For instance, in a case in which two affiliated companies have become over the years increasingly independent, such that the two entities are essentially independent, there may be reason for the court to exercise its equitable powers to protect the good will and investment in the trademark that the American company has individually developed over the years. Alternatively, an equitable remedy may also be called for in the case of a foreign company that does not wholly own its American subsidiary, for example, where the foreign affiliated company only owns ten percent of the American markholder's company. Cf. infra note 684. As I have explained supra, Katzel does not militate against the conclusion that an affiliated company may receive trademark protection pursuant to equity.
 
 
 86
 Although Katzel has never been reversed, and hence has some presumptive viability, because I view it as a decision that does not mandate a particular result in later cases, I do not think that it provides sufficient justification for the conclusion that the territoriality theory is alive and well in American trademark law. The key to the conundrum is that the Lanham Act is a statute addressing the rights of domestic trademark holders in the United States, and does not provide explicit guidance with respect to the harder issues of trademark rights in the international context. The place to look for the answer to the question whether the United States recognizes the territoriality theory in the context of international trademark rights is not domestic trademark law, but rather international law, as expressed in treaties.
 
 
 87
 As the district court pointed out, the United States is a signatory and member of the Paris Convention for the Protection of Industrial Property, as amended at Stockholm on July 14, 1967, which carries the force of law and recognizes that trademark rights are territorial. See 618 F.Supp. 700, 705 n. 1. The Convention states that
 
 
 88
 A mark duly registered in a country of the Union shall be regarded as independent of marks registered in other countries of the Union, including the country of origin.
 
 
 89
 Paris Convention, Article 6(3). The Paris Convention is the law in the United States by virtue of Article VI of the Constitution and is explicitly implemented by the Lanham Act in section 44(b), 15 U.S.C. Sec. 1126(b) (1982). See Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 640 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); Davidoff Extension S.A. v. Davidoff International, Inc., 221 U.S.P.Q. 465, 467, 1983 WL 203 (S.D.Fla.1983). Therefore, United States trademark law expressly recognizes trademark rights as territorial. I must conclude therefore that even though the Lladro trademark is owned by others outside the United States, Weil may own the American trademark in Lladro products in the United States, and that those trademark rights are separate from whatever trademark rights the Lladro parents own in other countries. What good these rights do it in this case is, of course, another matter, as I will explain infra.
 
 B. Katzel and K Mart
 
 90
 The majority opinion further buttresses its conclusion that Katzel is inapplicable to the facts of this case by arguing that such a conclusion is consistent with the holding of K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). I am not persuaded that K Mart is helpful on this point. First, K Mart addressed the question whether tariff regulations promulgated by the Customs Service precluding importation of gray market goods in certain circumstances were a reasonable interpretation of section 526 of the Tariff Act. The Court found that they were. The Court did not hold that all domestic markholders affiliated with foreign manufacturers are precluded from protecting their rights to their trademarks under the Lanham Act. Therefore, we must be careful in invoking K Mart in the Lanham Act context.
 
 
 91
 Second, to say that a narrow reading of Katzel is more consistent with the holding of K Mart than a more expansive reading does not provide a basis for the conclusion that section 32 should be construed one way or the other. A narrow reading of Katzel is consistent with K Mart, because the statute under examination in K Mart was passed solely and explicitly in response to the Court of Appeals' holding in Katzel, which was reversed by the Supreme Court. See K Mart, 108 S.Ct. at 1824 (Brennan, J., concurring) ("Congress' sole goal [in passing section 526] was to overrule Katzel."). In short, both the Congress and the Supreme Court overruled the Court of Appeals' specific holding in Katzel. Therefore, one would expect a later Supreme Court case (K Mart ) upholding regulations as consistent with a statute passed under the same impetus as that informing an earlier Supreme Court case (Katzel) to be consistent with that earlier case.
 
 
 92
 Third, and most important in my view, is the fact that even though both the Congress and the Supreme Court responded negatively to the Court of Appeals' decision in Katzel, their responses are fundamentally different. They are different because the two branches' powers are different. Legislation, by its nature, provides a blanket rule to be applied to certain specified circumstances. Section 526 of the Tariff Act permits the party in the Katzel situation to benefit from a blanket exclusion of parallel imports. The Supreme Court decision provides for equitable remedies in the face of inequities that can only be addressed on a case-by-case basis. In Katzel, the Supreme Court provided a second weapon over and above the statutory weapon for the trademark holder harmed by parallel importation.
 
 
 93
 However, just as there is no reason to believe that the Supreme Court meant for its equitable remedy to apply to every situation in which a domestic markholder is independent of a foreign manufacturer, there is no reason to believe that the Supreme Court in Katzel intended to preclude equitable remedies for domestic markholders who are affiliated with foreign manufacturers.
 
 
 94
 I note in this regard that Katzel was explicitly based on section 27 of the Trade-Mark Law of 1905, the predecessor of section 42. Katzel did not address section 16, the predecessor of section 32. Therefore, Katzel does not directly govern the law of trademark infringement, but only the law of importation of infringing marks. Therefore, aside from its example of the exercise of equitable powers to expand trademark law, I believe that the holding of Katzel helps neither side with respect to section 32. If it expands trademark law, as Weil argues, it only does so in the context of section 42, not section 32; if it is to be strictly limited to its facts, as Jalyn and amicus 47th Street Photo argue, it only limits section 42, not section 32.
 
 
 95
 To put the distinction between Katzel and K Mart another way, the trigger for the statutory customs protection described in K Mart is independence of domestic and foreign entities. The trigger for the judicial trademark remedy based on Katzel is the presence of inequities in a parallel importation context. Thus, I differ with the majority's use of K Mart as a yardstick by which to measure the reach of Katzel and therefore the scope of section 32.
 
 C. The Source Theory
 
 96
 The majority holds that the Lanham Act terms " 'copy,' 'simulate,' 'counterfeit' and 'imitate' have readily comprehensible ordinary meanings." Maj. op. at 671. But the majority goes on to read Katzel as mandating an exception to the ordinary meanings in the case of a domestic entity wholly independent of its foreign manufacturer. Id. at 673.[7] Under this view, the statute covers copies, simulations, counterfeits, and imitations and genuine goods of independent domestic entities, and, in short, covers all trademark situations except those in which the domestic entity is affiliated with the foreign manufacturer. As discussed supra, I do not believe that the Katzel decision resulted in a blanket amendment of the statute such that nonaffiliated companies may get trademark protection for genuine goods but affiliated companies may not. I would seek other authority for the claim that the trademark statute governs or does not govern genuine goods. In my view, that authority arises out of the developing common law of trademarks, particularly Premier Dental Products Co. v. Darby Dental Supply Co., 794 F.2d 850 (3d Cir.), cert. denied, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986), in this Circuit. I conclude that the Lanham Act potentially covers all genuine goods, not just those competing with the goods of an independent domestic company.
 
 
 97
 I believe that the authority for the proposition that genuine goods come under the purview of the Lanham Act can be found in part in the fact that trademark protection is no longer based solely or even primarily on the source of origin theory of trademark. Early in the history of trademark law, one of the sole bases for protection of trademarks was the protection of the public against confusion as to its source of origin. In other words, trademarks were valuable, because they identified the owner of the good. However, as the law developed, the trademark was no longer merely the source of information with respect to ownership, but rather the public came to believe that the trademark represented a certain level of product quality arising from one source. See 1 J. Gilson, Trademark Protection and Practice Sec. 1.03 (1988); F. Schechter,The Rational Basis of Trademark Protection, 40 Harv.L.Rev. 813 (1927).
 
 
 98
 In 1962, Congress amended section 32 of the Lanham Act. The italicized portion of the following provision was deleted: the infringement must be "likely to cause confusion, or to cause mistake, or to deceive purchasers as to the source of origin of such goods or services." J. Gilson, supra, Sec. 1.03. The amendment was intended to broaden the scope of the Act so that source of origin was no longer a necessary element of an infringement action. See Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 568 (2d Cir.1971); Osawa, 589 F.Supp. at 1173. As this Court stated in Premier Dental,
 
 
 99
 one need not manufacture a product to possess goodwill in it. In particular, it has been consistently held that if an exclusive distributor is known as the exclusive domestic source and as the one who stands behind the product in this country, it may own and enforce the trademark.
 
 
 100
 ....
 
 
 101
 What is relevant is whether the trademark has become sufficiently associated with Premier to justify the inference that buyers under that name are its customers. It is enough 'if the article be known as coming from a single, though anonymous source.'
 
 
 102
 794 F.2d at 856 (quoting Coty, Inc. v. LeBlume Import Co., Inc., 292 F. 264, 267 (S.D.N.Y.), aff'd, 293 F. 344 (2d Cir.1923)).
 
 
 103
 Thus, even if there were a source requirement in the statute, the identity of the source of the goods need not be known by the consumer:
 
 
 104
 [A] respectable segment of modern authority following the 'origin' view recognizes that the consumer is probably not familiar with the manufacturer of the trademarked product he buys. Thus, even where the 'origin' of the product is anonymous, and cannot be named by the consumer, a trademark may still function to denote origin where the consumer assumes that products bearing it come from the same source.
 
 
 105
 J. Gilson, supra, Sec. 1.03. Therefore, a trademark is not protected necessarily because it signifies a source of manufacturing origin.
 
 
 106
 If a trademark signifies a level of quality and not necessarily an identifiable source of origin, then trademark rights need not rest on whether the public can identify the manufacturer of the product, as the majority opinion implicitly suggests. Maj. op. at 669. Rather, the rights rest on whether the public identifies a particular level of quality when it sees a trademark on a product. Therefore, the markholder need not be the manufacturer, but may have trademark rights in the manufacturer's goods distinct, i.e., in different countries, from those the manufacturer retains. A fortiori, a genuine good marked with a genuine mark will have different legal consequences, depending on the country. And there may be a different entity in each country with the right to control those goods with that mark.[8]
 
 
 107
 The majority states that the "framers of the trademark act did not contemplate the instance in which the 'source' of a trademarked good would be different from its place of manufacture." Maj. op. at 673. Whether the "framers" contemplated such a possibility or not, the current Act recognizes the possibility that a trademark owner may not be the manufacturer in section 45, which states that a trademark may be "adopted and used by a manufacturer or merchant." 15 U.S.C. Sec. 1127.
 
 
 108
 Hence, I disagree with the majority's reliance on the plain meaning of section 32 and conclude that under the developing trademark law, and more specifically Premier Dental, that the source theory of trademark protection is no longer viable. Because the source of origin theory no longer exists as the primary criterion for enforcement of the trademark laws and in view of the viability of the territoriality theory, absent other considerations, I believe that Weil should be able to sustain a challenge under section 32 to Jalyn's parallel importation even though the goods which it claims are infringing are genuine goods with genuine marks.[9]
 
 D. Unity of Interest
 
 109
 In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court said the following about the unity of interest between a corporate parent and its wholly owned subsidiary:
 
 
 110
 A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.
 
 
 111
 467 U.S. at 771, 104 S.Ct. at 2741. In my view, this concept makes as much sense in the trademark context as it did in the antitrust context of Copperweld. Therefore, the unity of interest between a wholly owned subsidiary and its parent should be held to exist as a matter of law in the trademark context. Because of their unity of interest, we may attribute those self-help remedies available to the parent to be available a fortiori available to the subsidiary. The importance of this concept in this case becomes apparent infra.
 
 
 112
 I turn now to an application of these principles to the case at bar.
 
 E. Application of Section 32 to the Record
 
 113
 Section 32(1)(a) of the Lanham Act, 15 U.S.C. Sec. 1114(1)(a) prohibits
 
 
 114
 use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....
 
 
 115
 The majority states that "[c]onsumers who purchase Jalyn imported Lladro porcelain get precisely what they believed that they were purchasing," concluding that Weil is therefore not injured by Jalyn's imports. Maj. op. at 672. It is not clear to me that this is correct. The parties have stipulated to the fact that Weil only imports premium quality Lladro products, but Jalyn imports a mixture of premium quality and less than premium quality products. See Dist.Ct.Op. at 31 (sealed in published opinion).
 
 
 116
 The parties stipulated to the following for the purposes of the summary judgment motions:
 
 
 117
 There are four levels of quality for the porcelain made by Lladro, S.A. The lowest quality is destroyed and not sold. Porcelain of the next level of quality are designated 'seconds' and such items are only sold at Lladro, S.A.'s factory outlet in Valencia, Spain, as 'seconds,' after the 'flower' logo has been physically removed.
 
 
 118
 The remaining quality categories are 'A' first quality and 'B' first quality, 'A' being a higher grade level than 'B'. Lladro, S.A.'s grading of its porcelain into 'A' and 'B' categories of quality is highly confidential and its customers and purchasers throughout the world and in the United States are not made aware of this internal grading of quality. No evidence has been submitted by either party as to the magnitude of the difference in quality between 'A' first quality and 'B' first quality.
 
 
 119
 Appellee's Br. at 8. All levels bear the same trademark.
 
 
 120
 Under these circumstances, those consumers buying Lladro in the United States, who have developed expectations with respect to Lladro's products on the basis of Weil's performance over the years, are possibly being deceived as to the quality of the product when they buy Jalyn-imported goods. Arguably then, the importation of the goods by Jalyn is not only resulting in deception of the public, but it is also harming Weil's investment in goodwill. Therefore, under both of the policies set forth by the majority,[10] the competing parallel imports in this case could be banned by the Lanham Act. I therefore disagree with the majority's assertion that "Weil's investment in and sponsorship of its trademark is not adversely affected because the goodwill that stands behind its product is not diminished by an association with goods of a lesser quality." Maj. op. at 672.
 
 
 121
 Quite to the contrary, Weil's investment in creation of goodwill and reputation for quality could well be harmed by Jalyn's importation of Lladro mixed-quality goods.[11] Thus, I believe that Weil has a colorable claim under section 32 as the district court found and that the district court did not err when it determined that Weil could be injured by Jalyn's importation. However, " 'it is a "familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." ' " K Mart, 108 S.Ct. at 1821-22 (Brennan, J., concurring) (quoting Steelworkers v. Weber, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979) (quoting Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892))).
 
 
 122
 Neither the equities of this case nor the goals of the Lanham Act permit me to conclude that Weil should find a remedy for its claimed injury in this case. The source of the confusion in this case is not Jalyn, but Weil's parent, Lladro. As discussed supra, I would hold that a wholly owned subsidiary and its parent have, as the Supreme Court in Copperweld stated, "a complete unity of interest." 467 U.S. at 771, 104 S.Ct. at 2741. I therefore believe that the injury here is self-inflicted and that likelihood of confusion has not been established as that phrase was intended under the Lanham Act. To protect Weil's interest in its American trademark, Weil's parent, Lladro, could affix different trademarks to each corresponding level of quality, different trademarks to those products imported into the United States by Weil and those sold elsewhere in the world, and/or inform the public of the differences in quality, thereby precluding the possibility of deception or confusion.[12]
 
 
 123
 Moreover, if Lladro has forbidden Jalyn from disclosing the different levels of quality, it has engineered the injury to Weil by preventing Jalyn from differentiating its products from Weil's. If Lladro is in fact engineering the possibility of infringement by selling its lesser quality products with the same trademark as its higher quality goods and also prohibiting its buyers from disclosing those differing levels of quality to consumers, then I do not believe that the equities should permit recovery under the Lanham Act even though Weil may have satisfied its technical requirements. In fact, to find otherwise would add an entirely new and mischievous gloss on the meaning of likelihood of confusion.
 
 
 124
 But even if Lladro would permit Jalyn to reveal the differing levels of quality of its goods so as to mitigate the likelihood of confusion, the fact remains that Lladro has full power to use different trademarks for different levels of quality and thereby prevent the harm to Weil's reputation resulting from Jalyn's importation of lesser quality Lladro products. Lladro also has a more effective remedy against infringement of the trademark owned by Weil; it may refuse to sell its goods to American importers or it may sell only on the condition of restrictions on resale, as the majority notes. See maj. op. at 668 n. 10 (quoting K Mart, 108 S.Ct. at 1823 (Brennan, J., concurring)). I would hold therefore that the wholly owned subsidiary whose parent sells products on the open market deficient in quality (as compared to those imported by its subsidiary), but marked identically, may not prevail on a section 32 claim where the only evidence of likelihood of confusion is the claim that different quality goods are on the market with identical trademarks.
 
 
 125
 In my view, once we refuse to recognize the different levels of quality as support for Weil's argument with respect to likelihood of confusion, Weil could not, in any event, prevail. That was virtually the only evidence relied upon by the district court in concluding a likelihood of confusion. See Dist.Ct.Op. at 31 (not in published opinion because under seal, see 618 F.Supp. at 713-14). A fortiori, even if we set aside the evidence with respect to different quality levels, Weil has failed to produce evidence creating a genuine issue of material fact with respect to likelihood of confusion.
 
 
 126
 Yet, even if Weil/Lladro had not created the opportunity for infringement by marketing two different levels of quality bearing the identical mark, I do not believe Weil could prevail. This is largely because Weil is a wholly owned subsidiary. Because Weil and Lladro share a unity of interest, I believe that Weil would have an extremely difficult if not impossible time proving a separate and independent good will. See Premier Dental, 852 F.2d at 855. Indeed, the evidence it produced before the district court with respect to advertising and inspection of the products is inadequate to create a genuine issue of material fact as to separate and independent good will in my view.[13]
 
 
 127
 In summary, nothing in the Act itself or the developing trademark common law and international law would necessarily preclude protection of genuine goods with genuine marks. Thus, analytically, the district court was correct. But the aims of the Act, protection of the public from deception and protection of the markholder from harm to his investment in goodwill, are not served by providing protection in this situation. I would not expand the definition of likelihood of confusion to a situation in which a wholly owned subsidiary and foreign parent create the confusion by affixing the same mark to goods different in quality. Therefore, I concur with the majority opinion's judgment that the district court erred by granting summary judgment in favor of Weil. I too would enter judgment in favor of Jalyn on the section 32 claim.
 
 II. SECTION 33
 
 128
 For the same reasons that I believe that section 32 should be available in the parallel importation context, I also believe that section 33 should be available. But neither should be available in this particular context. Section 33 provides evidentiary advantages for the registrant, precluding the necessity of proving all of the elements of section 32 in order for the party to prevail on an infringement claim, but I do not believe it differs from 32 in any other respect significant for consideration in this case.
 
 III. CONCLUSION
 
 129
 I sum, I have a fundamentally different understanding from the majority of the state of trademark law in the United States at this time. Under the currently viable theory of territoriality and the fact that the product's source of origin is no longer the basis on which trademark rights are based, I cannot say that a United States markholder affiliated with a foreign manufacturer cannot maintain an infringement suit under the Lanham Act.
 
 
 130
 I am confident, however, that the Lanham Act was not intended to provide foreign manufacturers the power to engineer the possibility of infringement by labelling goods of different levels of quality with the same trademark and thereby creating confusion.
 
 
 131
 For these reasons, I would hold that Weil has failed to prove likelihood of confusion as that phrase was intended to be understood under the Lanham Act. In my view, a wholly owned subsidiary and its parent have a complete unity of interest and therefore self-help available to the parent is a fortiori available to the subsidiary. Moreover, the spirit of the Lanham Act would not tolerate an expansion of the definition of likelihood of confusion such that a parent may create the likelihood of confusion by affixing the identical trademark to premium and lower quality goods and then sending the lower quality goods into the stream of commerce to compete with its subsidiary's premium goods. In this case, Lladro and therefore Weil could easily prevent the potential confusion and deception of the public and thus preclude any injury from infringement. For these reasons, I conclude that Weil may not recover under either sections 32 or 33 of the Lanham Act.
 
 
 
 *
 Honorable Edward Dumbauld, Senior United States District Judge for the District of Western Pennsylvania, sitting by designation
 
 
 [1]
 The term "gray-market goods" refers to foreign manufactured goods, for which a valid United States trademark has been registered, that are legally purchased abroad and imported into the United States without the consent of the American trademark holder
 Appellants in the present case note that the term "gray-market" unfairly implies a nefarious undertaking by the importer, and that the more accurate term for the goods at issue is "parallel import." We agree that the term parallel import accurately describes the goods and is, perhaps, a better term because it is devoid of prejudicial suggestion. For that reason, we use that term in this discussion. However, we also employ the term "gray-market" good because, for better or worse, it has become the commonly accepted and employed reference to the goods at issue. See K Mart, 108 S.Ct. at 1814.
 
 
 [2]
 The specific character of the relationship between Lladro, S.A. and Weil is that they share a common parent corporation, Sodigei, S.A. Sodigei is a Spanish corporation that is wholly owned by the Lladro family. It owns Lladro, S.A. as well as three other Spanish corporations which together own 100% of the stock of Lladro Exportadora, S.A. Lladro Exportadora owns 100% of Weil
 
 
 [3]
 The section is commonly referred to as Sec. 526, notwithstanding its enumeration as Sec. 1526 in its present statutory codification. The statute was originally enacted as Sec. 526 of the Tariff Act of 1922, 42 Stat. 975. It was subsequently reenacted in identical form as Sec. 526 of the 1930 Tariff Act, 19 U.S.C. Sec. 1526, hence its present statutory designation
 
 
 [4]
 Section 133.21 implements the "[r]estrictions on importations of articles bearing recorded trademarks and tradenames." 19 C.F.R. Sec. 133.21 (1987). Significantly, however, the section delineates specific circumstances in which the restrictions do not apply. In pertinent part, the regulation provides that
 [t]he restrictions set forth in [this section] do not apply to imported articles when:
 (1) Both the foreign and the U.S. trademark or trade name are owned by the same person or business entity; [or]
 (2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control
 
 
 [19]
 C.F.R. Secs. 133.21(c)(1), (2) (1987) (emphasis added)
 
 
 [5]
 In part I of Justice Kennedy's opinion, in which Chief Justice Rehnquist and Justices White, Blackmun, O'Connor and Scalia joined, the Court held that "the common-control exception of the Customs Service Regulation, 19 C.F.R. Sec. 133.21(c)(1)-(2) (1987), is consistent with Sec. 526." K Mart, 108 S.Ct. at 1817. That holding was concurred with in an opinion by Justice Brennan in which Justices Marshall and Stevens joined. See id. 108 S.Ct. at 1819-22
 Significantly, a separate majority of the Court concluded that subsection (c)(3) of the regulation, which precluded the domestic trademark holder from prohibiting the importation of goods made by an independent foreign manufacturer whom the domestic markholder has authorized to use the trademark, could not stand. As to that scenario (case 3), the Court concluded that
 [u]nder no reasonable construction of the statutory language can goods made in a foreign country by an independent foreign manufacturer be removed from the purview of the statute.
 K Mart, 108 S.Ct. at 1818-19 (emphasis added). In this holding, as in the Court's holding as to the case 1 and case 2 scenarios (and, in our view, Katzel ) the court relied upon the corporate relationship between the domestic markholder and the foreign manufacturer in the determination of the appropriate trademark protection.
 
 
 [6]
 The concurring opinion of Justice Brennan went further than the majority's view that Sec. 133.21 was valid because it was a reasonable construction of ambiguous language in Sec. 526. Justice Brennan stated explicitly that "Congress did not intend to extend Sec. 526's protection to affiliates of foreign manufacturers (case 2)". 108 S.Ct. at 1820 (Brennan, J., concurring). He concluded that
 the legislative history and purpose of Sec. 526 confirm ... that if Congress had any particular intent with respect to the application of Sec. 526 to trademark owners affiliated with foreign manufacturers, it was to exclude them from its shield.
 Id. 108 S.Ct. at 1826. It appears, therefore, that at least three of the Justices are of the explicit view that Sec. 133.21 is not only a reasonable construction of Sec. 526 in the case 2a scenario, but that it is the correct interpretation of the legislative intent of that statute.
 
 
 [7]
 Our prior holding in Premier Dental Products v. Darby Dental Supply Co., 794 F.2d 850 (3d Cir.1986), is not contrary to our holding today, and neither is it inconsistent with K Mart. Premier Dental was a case 1 circumstance in which we held that Sec. 526 was applicable to preclude the import of parallel goods. That holding was limited to the instance in which the domestic trademark holder and the foreign manufacturer were separate entities. Specifically,
 [w]e conclude[d] that where a trademark is owned and registered in this country by an exclusive distributor who is independent of the foreign manufacturer and who has separate goodwill in the product, the distributor is entitled under Section 526 to prevent the importation even of genuine merchandise obtained from the same foreign manufacturer.
 Premier Dental, 794 F.2d at 858 (emphasis added).
 
 
 [8]
 See K Mart, 108 S.Ct. at 1832 n. 1 (Scalia, J., dissenting in part and concurring in part) (noting that 19 C.F.R. Sec. 133.21(a), which the majority invokes and which concerns the copying or simulation of trademarks or trade names, is unrelated to Sec. 526(a), "but rather implements Sec. 42 of the Lanham Trade-mark Act")
 
 
 [9]
 That corporate relationship began in 1968 when Lladro, S.A. purchased fifty percent of Weil
 
 
 [10]
 Cf. K Mart, 108 S.Ct. at 1823 (Brennan, J., concurring). Justice Brennan noted that
 if the gray market harms a U.S. trademark holder in case 2a, 2b, or 2c, that firm and its foreign affiliate (whether a parent, subsidiary, or division) can respond with a panoply of options that are unavailable to the independent purchaser of a foreign trademark. They could, for example, jointly decide in their mutual best interests that the manufacturer (1) should not import directly to any domestic purchaser other than its affiliate; (2) should, if legal, impose a restriction against resale (or against resale in the United States) as a condition on its sales abroad to potential parallel importers; or (3) should curtail sales abroad entirely.
 We note that additional self-help mechanisms available to the corporate entity in the case 2 circumstance include: sale of the products abroad at the same price as they are sold domestically, thereby assuring the same margin of profit; or distinguishing the goods sold abroad--either by producing or packaging or marking them differently, thereby assuring that the trademark will not be placed in domestic competition. See note 16 infra. Because this "panoply" of options is available to the domestic trademark holder in the case 2 scenario, the arguments for extension of the protections provided by the trademark act are much less compelling than they are in the case 1 circumstance.
 
 
 [11]
 This is the conclusion reached by the district court. The fact that it made no finding that the porcelain distributed by Jalyn and that distributed by Weil are materially different is significant to our disposition of this appeal. Weil has contended on this appeal that the porcelain imported by Jalyn was of a materially different grade and quality from the porcelain imported by Weil. If true, that fact would provide a stronger argument for Weil's claim of trademark infringement. See Original Appalachian Artworks v. Granada Electronics, 816 F.2d 68, 73 (2d Cir.1987) (holder's trademark was infringed where dolls manufactured abroad were "materially different" from those manufactured in U.S., despite the fact that a single entity owned the trademark worldwide); El Greco Leather Products Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir.1986) (Lanham Act protects "the right to control the quality of the goods manufactured and sold under the holder's trademark.") However, we cannot reach that conclusion on the findings of record, and we premise our decision on the assumption that the porcelain imported by Jalyn was essentially identical to that imported by Weil
 
 
 [12]
 See H.R. 1223, 67th Cong., 2d Sess. 158, 62 Cong.Rec. 11602-05 (1922)
 
 
 [13]
 The argument is well made that, having resolved the appropriate scope of Sec. 526, there is nothing left to the inquiry regarding Sec. 42. Section 526 was enacted specifically in response to the intermediate appellate court's opinion in Katzel with the intent to close an interstice that Congress perceived existed in the then existing trademark law and resulted in the decision by the Court of Appeals for the Second Circuit in Katzel. Thus, the scope of protection that Congress intended Sec. 42 to provide is embodied in Sec. 526. (Indeed, some commentators have suggested that, in light of the Supreme Court's subsequent decision in Katzel, Sec. 526 was rendered a nullity as a redundant statement of what the trademark law already provided.) Moreover, the legislative history reflects that, by passing Sec. 526, Congress intended not only to amend the customs laws but to amend the trademark law as well. In that light, the reasonable interpretation of the scope of Sec. 526 may also be read as the reasonable interpretation of Sec. 42. See K Mart, 108 S.Ct. at 1824 & 1824 n. 5 (Brennan, J., Concurring); see also Note, Vivitar Corp. v. United States and Osawa & Co. v. B & H Photo: The Issue of Common Control in the Parallel Importation of Trademarked Goods, 17 Law & Policy in Int'l Bus. 177 (1985)
 The alternate view to this interpretation is that the scope of the trademark law was extended by the Supreme Court's decision in Katzel, which, although decided subsequent to the passage of Sec. 526, did not make reference to that section in its holding. (In deciding Katzel, the Supreme Court applied Sec. 27 of the Trademark Act of 1905, Act of Feb. 20, 1905, ch. 592, Sec. 27, 33 Stat. 730, which is identical to the Sec. 42 of the present act). It is argued, therefore, that Sec. 42 should be read with broader authority, without reference to Sec. 526. We will assume, arguendo, the correctness of this view. It does not, however, affect the disposition of this case. As we have held, supra, Katzel is properly read only to apply to the case 1 circumstance. Thus, any extension of the protective authority of Sec. 42 that Katzel established is limited to that scenario and, accordingly, is not applicable to the present case.
 
 
 [14]
 We note incidentally that, at the time of the enactment of section 42, there apparently was a long-standing regulatory interpretation of section 27, the predecessor of section 42, that the importation of genuine goods with genuine marks was not under the purview of the import provisions of the Lanham Act. Rather the terms "copy or simulate" applied only to counterfeit marks. Congress carried forward section 27's "copy or simulate" language into section 42, fully aware that it had been interpreted to mean "counterfeit," in effect ratifying Customs' interpretation of section 27 when it passed section 42 with identical language. I believe that, under those circumstances, Congress cannot be deemed to have intended the terms "copy or simulate" in section 42 to be given a "plain" meaning. To the contrary, Congress carried over the already interpreted and defined language as a means of continuing the Customs import practices that had been in existence since the passage of section 526 in 1922
 
 
 [15]
 See also, Park'N Fly, Inc. v. Dollar Park and Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose") (emphasis added) (citing American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982))
 
 
 [16]
 Although the statute does not define each of these terms individually, it offers some definitions that we find instructive to our disposition. Section 1127, which is titled "Construction and Definitions; intent of chapter," defines the term "colorable imitation" to mean "any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." 15 U.S.C. Sec. 1127 (1982) (emphasis added). Similarly, the term "counterfeit" is defined to mean "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Id. (emphasis added). Neither of these definitions encompass the goods that are at issue in the present case and, in light of this clarifying statutory language, we are further inclined to our conclusion that the sections are not applicable
 
 
 [17]
 The legislative history of Sec. 42 is in accord with this statement of the purposes underlying the Lanham Act. The Senate report of the act noted that
 [t]he purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.
 S.Rep. No. 1333, 19th Cong.2d Sess., reprinted in 1946 U.S.Code Cong.Serv. 1274.
 The Report stated further, in its enumeration of the specific goals of the Lanham Act, that that act would "secure trade-mark owners in the goodwill which they have built up and ... protect the public from imposition by the use of counterfeit and imitated marks and false trade descriptions." Id. at 1276.
 
 
 [18]
 We note further that this "injury" to Weil occurs as the result of its expenditure of money to popularize the foreign manufacturer's mark in the United States. As one commentator has noted, a domestic company in Weil's circumstance could certainly ensure to themselves the full protections of the trademark law and avoid this "injury" by developing and registering its own trademark for the foreign manufactured goods, and expending its resources popularizing that mark. See Vandenburgh, The Problem of Importation of Genuinely Marked Goods is Not a Trademark Problem, 49 T.M.R. 707, 718 (1959). The article notes, however, that that approach is often less desirable to the distributor and suggests two reasons to explain why: (1) the foreign manufacturer's mark is already known in this country, and therefore the product is easier to sell; and (2) the foreign manufacturer's product is a high quality product that cannot be duplicated by another supplier. Id. If these reasons are accurate, they provide further demonstration of the inapplicability of the trademark law to this case. They indicate, as the article suggests, that the " 'source' that the public looks to for the quality of the product [is] really that of the manufacturer rather than that of the distributor," id., and, consequently, that the distributor's "good will" in the product is not diminished by the distribution of other genuine goods
 
 
 [19]
 We are aware that our conclusion results in the seeming anomaly that the language of the trademark act will be read one way in light of the circumstances of some cases (i.e., case 1) and that that same language will be read another way in all other circumstances. This result, however, we believe is correct and mandated by the decision of the Supreme Court in Katzel. The seeming conflict is made scrutable, however, with the recognition that the source of the added protection to trademark holders in the case 1 scenario is Katzel and Sec. 526 (as that statute has been construed by the Customs Agency)--not in a subjectively different reading given to the text of the statute
 
 
 [1]
 I do not address Sec. 42 in this concurrence, because I join in the majority's conclusion with respect to Sec. 42 as stated in its footnote 14. See maj. op. at 671 n. 14. I agree with the majority's conclusion that Sec. 42 is not available in the context of parallel importation, but I would come to that conclusion based on the history of the enactment of the section rather than its plain language
 
 
 [2]
 The international status of trademarks is far from settled. See Note, Vivitar Corp. v. United States and Osawa & Co. v. B & H Photo: The Issue of Common Control in the Parallel Importation of Trademarked Goods, 17 L. & P. Int'l Bus. 179, 197 (1985)
 
 
 [3]
 The law of trademarks is an amalgam of statutory provisions, treaties, and common law. "It is generally stated that trade-mark statutes merely grant procedural rather than substantive rights." Note, Trade-Mark Infringement: The Power of an American Trade-Mark Owner to Prevent the Importation of the Authentic Product Manufactured by a Foreign Company, 64 Yale L.J. 557, 561 (1955)
 
 
 [4]
 The reasoning of Katzel was affirmed by the Supreme Court in A. Bourjois & Co. v. Aldridge, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam), which answered affirmatively questions certified at 292 F. 1013, 1014 (2d Cir.1922), whether Sec. 27 of the Trade-Mark Law of 1905 barred importation of goods produced abroad and bearing the genuine trademark where a foreign markowner assigned its United States trademark rights to an independent United States entity
 
 
 [5]
 The territoriality theory was a repudiation of the universality theory that a mark is either universally valid or invalid. See Osawa, 589 F.Supp. at 1171 (describing the theory of universality: "if a trademark was lawfully affixed to merchandise in one country, the merchandise would carry that mark lawfully wherever it went"). The universality theory is no longer viable. See, e.g., K Mart Corp. v. Cartier, Inc., --- U.S. ----, 108 S.Ct. 1811, 1822, 100 L.Ed.2d 313 (1988) (Brennan, J., concurring)
 The doctrine of exhaustion developed as a corollary to the universality theory. Under this doctrine, once the markholder has sold an item, the subsequent sale of that item cannot serve as the basis for an infringement suit. The relevant issue for this case with respect to exhaustion is whether the doctrine of exhaustion is meant to apply only within the borders of a sovereign or whether it applies universally, such that a sale in one country prevents an infringement suit in another.
 The latter position would make no sense in the context of the territoriality of trademarks. "[I]n international trade, a trademark symbolizes the geographically distinct goodwill of the domestic owner of the mark." Note, The Gray Market Case: Trademark Rights v. Consumer Interests, 61 Notre Dame L.Rev. 838, 853 (1986). If every time a foreign manufacturer placed its product on the market, the trademark rights were universally exhausted, then the territoriality theory of trademark rights would lose most of its force and the right to control the trademark of an internationally available good in a given country would not be of much value. In fact, if the exhaustion theory were viable, that would mean that once a manufacturer sold the product to the domestic markholder, the product's trademark rights were exhausted and the domestic markholder could not assert his rights under the trademark laws. That makes no sense where trademark rights may rest in nonmanufacturers and the Lanham Act recognizes the validity of the assignment of trademarks.
 The more coherent way to view exhaustion in the context of the territoriality theory is to view it as applying individually to each markholder such that a markholder only exhausts its own trademark rights upon sale of the item, and not the trademark rights of other markholders in other countries. See Note, The Greying of American Trademarks: The Genuine Goods Exclusion Act and the Incongruity of Customs Regulation 19 C.F.R. Sec. 133.21, 54 Fordham L.Rev. 83, 109 (1985) ("When local goodwill is established, only the foreign trademark owner's rights are exhausted by sale to the U.S. trademark owner. Thus, the U.S. trademark owner's rights over its trademark exist until it sells the trademarked good in the domestic market." (footnotes omitted)). Thus, even if the exhaustion theory is valid within the borders of a sovereignty, it cannot be valid with respect to all sales of trademarked goods in light of the viability of the territoriality theory in international trademark law.
 
 
 [6]
 I note some uncertainty as to whether the majority understands Katzel as effectively amending trademark law or as a case solely turning on its facts. In contrast to my observation in the text, the majority also seems to say that the Katzel decision is not an across-the-board rule, but rather a rule to be applied on a case-by-case basis. It states that this case does not present the "compelling circumstances" found in Katzel, Maj. op. at 668, implying that the result could be different if the circumstances were compelling and finds that "even if Weil loses some share of its United States market to Jalyn, it nonetheless benefits from the profits it received as part of the corporate entity from which Jalyn purchased the goods abroad. Moreover ... [Weil] has an obvious self-help mechanism: it can cease the sale to Jalyn abroad and thereby eliminate effectively its United States competition with Weil." Id. If the majority is attempting an individualized determination of the equities in applying Katzel, I believe that to be the better methodology
 It is more likely, however, that it is not applying the rule on a case-by-case basis, because its assertions with respect to "self-help mechanisms" are not supported in the record, but are generalized presumptions about the relationship between wholly owned subsidiaries and their parents. The district court had no facts before it with respect to Weil's and Lladro Exportadora's corporate relationship relating to profits or elimination of competition abroad. At all events, I agree with the majority's implicit assumption that all wholly owned subsidiaries should be treated as having a unity of interest with their parents, as I discuss infra.
 
 
 [7]
 I believe that the majority undercuts its own plain language analysis in footnote 19 of its opinion. Where the "language of the trademark act will be read one way in light of the circumstances of some cases ... and that same language will be read another way in all other circumstances," it seems to me that the plain language cannot control our disposition of the case. Maj. op. at 673 n. 19. Rather, we must look beyond the plain language and examine the Act and trademark law as a whole
 
 
 [8]
 These principles were the foundation of Weil's summary judgment motion--of the money it spent and the efforts it made to establish the Lladro products provided and distributed by it so as to create public identification of Weil as the source of the buyer's assurance of quality
 
 
 [9]
 I admit that trademark law would be more streamlined if neither Sec. 32 nor Sec. 42 applied to genuine goods. Both Jalyn and amicus 47th Street Photo have argued forcefully that we must interpret these provisions in tandem. However, there is no internal conflict in finding that an article may be imported, but may also form the basis of a trademark infringement suit. As this concurrence makes clear, cases involving genuine goods, although based on sound trademark principles, must be carefully analyzed to ascertain that the aims of the Lanham Act are being furthered. Therefore, even though genuine goods may be imported pursuant to Sec. 42, they may or may not provide the basis for an infringement suit
 
 
 [10]
 The majority sets forth two policies behind the Lanham Act: (1) "protection against consumer deception" and (2) "protection of the trademark holder's investment in goodwill," concluding that "neither of the goals is undermined by the importation of genuine goods as in this case." Maj. op. at 672
 
 
 [11]
 It is at this juncture that I take issue with the majority's reliance on the Ninth Circuit case of NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506 (9th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). I have dealt substantively with the approach taken in NEC in the text of this concurrence. In addition to these substantive objections, I believe that NEC is distinguishable from this case on its own terms. In that case, the Ninth Circuit also held that trademark law generally does not reach the sale of genuine goods bearing a true mark where the domestic markholder is not independent of the foreign manufacturer. The court stated that "[t]he reason is that trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." 810 F.2d at 1509. That reason does not operate in this case, because here we have the real possibility of confusion and deception of the public because of the use of the same trademark on apparently similar goods of varying levels of quality. Therefore, I believe that the justification for the rule announced in NEC does not apply here and that trademark law should apply even though the goods are genuine and even though the domestic markholder is affiliated with the foreign manufacturer
 
 
 [12]
 In fact, Lladro removes the flower logo from the second lowest level of quality products. The products with the lowest level of quality are destroyed. See supra at 682
 
 
 [13]
 Moreover, there would be few if any instances in which Weil/Lladro could not prevent the possibility of infringement, making Lanham Act protection inappropriate in most instances. I note in passing that this principle is a corollary to the principles of equity implicit in the Katzel decision--there, complete independence between the manufacturer and the distributor precluded the independent domestic markholder from preventing the infringement. Here, the complete unity of the manufacturer and the distributor/subsidiary makes it possible for the domestic markholder to be charged with prevention of the infringement
 The much more difficult case in my view and one we do not address here today is the case of the less than wholly owned subsidiary. For example, a unity of interest may or may not exist between a subsidiary and its parent where the parent owns 20, 40, or even 60 percent of the subsidiary. I also note that this would be a more difficult case if the infringement suit had been brought, e.g., the day after the purchase of Weil by Lladro.